UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

   Plaintiff,

           Case No.  20-20550

v.

           Hon. Stephen J. Murphy

Arash Yousefi Jam,

   Defendant.

_____/

## Government's Response Opposing Defendant Arash Jam's Motion for Bond

Over a two-year period, Arash Jam, his brother Amin Jam, and Abdollah Momeni lied to American companies, purchased more than $100,000 in sophisticated American goods, and shipped those goods through the United Arab Emirates (UAE) to Iran in violation of U.S. sanctions. Arash and his team told the U.S. companies that they were working on behalf of the Iraqi Government or that the final destination of the goods was the UAE, even though Arash and his team knew all along that the goods were destined for Iran.

When companies confronted Arash and his team about the ultimate destination—stating that they believed that the goods were

1

destined for Iran—the coconspirators created fake paper trails to "show" that the goods were destined for the UAE . . . or simply found other sellers. In other instances, Arash and his team were more forthright about the goods' ultimate destination. For example, when a U.S. shipping company made it clear that a license from the U.S. Department of Treasury, Office of Foreign Assets Control (OFAC) was required to ship the goods to Iran, as the coconspirators had requested, Amin Jam asked if there was a way around the requirement or if the U.S. shipping company could recommend another shipping company that would fulfill the order. When the U.S. company responded "no" to both questions, the conspirators found Iranian and global shipping companies willing to bypass U.S. sanctions—and then coordinated the shipping logistics in a manner to intentionally hide the ultimate destination from the American companies.

The government arrested Arash Jam, a Canadian Permanent Resident and Iranian Citizen, when he flew into the United States on December 23, 2020 (the government took his Canadian Passport but believes that Arash still has an Iranian Passport). Arash Jam's brother, Amin Jam, remains in Canada where he is contesting extradition.

Abdollah Momeni is believed to be in Iran—which does not extradite to the United States. Arash Jam now asks this Court for bond.

Jam poses a significant risk of nonappearance: he has no ties to the United States, significant familial and professional ties to Iran and Canada, and, facing a significant prison sentence, an incentive and the means to flee. The government agrees with Pretrial Services that Jam is a flight risk and requests his pretrial detention.

## I.     Factual Proffer

From 2015 to 2017, Arash Jam, his brother Amin Jam, and Abdollah Momeni deceived multiple U.S. manufacturers and shipping companies to illegally export sensitive goods from the United States to Iran in violation of U.S. sanctions. The coconspirators *transshipped* the goods, sending them from the U.S. to an intermediate destination—the UAE—before being taken to a final destination—Iran.

The investigation started when one of the victim companies reported that goods sold to Arash were likely sent to Iran in violation of U.S. law, and provided the email account Arash used for the purchase. Law enforcement obtained a federal search warrant for Arash's account and learned that Arash was working with Amin and Momeni to illegally

export goods to Iran. Agents obtained search warrants for five separate email accounts used by the conspirators to illegally procure goods from the United States (and from countries around the world) to Iran.

Emails show that Arash, Amin, and Momeni made numerous misrepresentations to U.S. companies over a multi-year period to obtain goods while deceiving the companies about the ultimate destination of those goods. Arash and his coconspirators purchased railroad crankshafts, servo motors, and electric discharge machining ("EDM") technology from U.S. companies and surreptitiously shipped those goods through the UAE to Iran. These items were subject to the U.S. sanctions regime; it was unlawful to supply any of these items to Iran without an OFAC license, which evidence shows Arash and his team never sought or obtained.

Specifically, Arash and his team successfully deceived at least three U.S. companies by, among other things: (1) representing that the purchased goods were destined for and intended to be used in Iraq or the UAE when, in fact, the final destination all along was Iran; (2) facilitating the transactions using foreign bank accounts located in, among other places, the UAE, Uganda, Hong Kong, and Turkey; and (3)

obscuring the intended end destination by using different shipping companies to segregate the U.S. leg of the shipment from the Iranian leg. Evidence shows that Arash and his coconspirators were well aware of the legal requirements for shipments to Iran that required OFAC licenses, but procured the goods and shipped them to Iran nonetheless.

*Transactions 1 and 2—U.S. Company 1*

In January 2015, Arash emailed U.S. Company 1 with a price request for nine electrical discharge boards (components of an electrical discharge machine, which uses thermal energy to remove metal in order to create the desired shape; the electrical discharging process has myriad applications in the automotive, aerospace, and other high-technology manufacturing industries).

On multiple occasions U.S. Company 1 asked Arash for the model and serial number of the EDM machine for which he sought parts. Arash knew that he could not provide the actual serial number because the machine was in Iran. In fact, when attempting to obtain a competing quote on the parts from a UK company, Arash provided the actual serial number—10853. The UK company responded that the machine "is in a prohibited Country" and therefore, it would "not send"

5

a price quote to Arash (records from the manufacturer confirm that machine with serial number 10853 was sold to SAIPA, an Iranian automaker in Tehran, in 2004). Rather than repeating this mistake, when U.S. Company 1 again asked for the serial number in May 2015, Arash found a similar EDM machine for sale online, reached out to the company selling the machine, obtained the serial number (10744), and provided *that* serial number to U.S. Company 1.

Arash negotiated a discount for the EDM boards with U.S. Company 1, a subsidiary of a Spanish Company, with the understanding that the parts would be shipped from Spain to save money. Later in May, the Spanish company refused to ship the parts to Arash because it believed that "these parts are being sent to Iran" based off identical purchase requests received by subsidiaries in other countries. Arash emailed U.S. Company 1, insisted that the machine was in the UAE, and arranged shipment from the U.S. to the UAE instead. The boards were exported on May 22, 2015.

At the end of the negotiations for the nine EDM boards, Arash emailed U.S. Company 1 and stated that he needed an additional part— a CPU board for the EDM machine. U.S. Company 1 again asked for the

model and serial number of the EDM machine in which the CPU board would be installed because it was the "brains" of the machine, and needed the correct model and serial number to load the proper software. Arash again stated the machine had serial number "10.744." After price negotiations, the board was exported in July 2015.

Records confirm that a bank in the UAE transferred the money to U.S. Company 1 for these items.

In February 2016, Arash emailed U.S. Company 1 complaining that the CPU board was not working properly. U.S. Company 1 asked yet again for the machine's serial number, and Arash provided number 10744. U.S Company 1 responded that the machine with serial number 10744 was in Romania, and that the machine would not function properly if Arash provided the wrong serial number (records obtained by the government confirm that the EDM machine with serial number 10744 was sold by the European company that Arash contacted to a Romanian company in November 2015; it was never in the UAE).

*Transaction 3—U.S. Company 2*

In September 2015, Arash and his coconspirators acquired two servo motors—an electrical device that can push or rotate an object with

great precision—from U.S. Company 2. Records show that a bank account in the UAE paid for the servo motors by sending the funds through a bank in Uganda.

Arash emailed the servo motors' packing slip to Amin, who forwarded the packing slip to two freight companies located in Iran. Two days later, Amin emailed a U.S. shipping company and inquired about the cost of shipping "electro motors" from the U.S. to Iran. The shipping company provided Amin a price quote but told him that an "OFAC LICENSE IS REQUIRED" (emphasis in original). Amin then pressed the company and asked whether there was any way it could ship the goods. The shipping company employee repeated that he could not ship the goods without a license and that if he did, he would lose his job and his company would be fined. Amin then asked whether he could change the port of discharge to a port in the UAE and switch the bill of lading. The shipping agent refused because he said that he "kn[e]w" the goods were destined for Iran. Amin asked for a recommendation for another shipping company that would fulfill the order. The shipping agent responded, "I don't know any forwarder that will risk it. U[S] customs can shut them down with big fines."

Undeterred, Amin then emailed the packing slip to three more Iranian shipping companies and asked for price quotes to ship the goods from the U.S. to Iran. One Iranian company provided a quote to ship the goods from the U.S. to a port in the UAE and then repackage and reship the goods to Bandar Abbas, Iran: the same method of shipping that Amin asked the U.S. shipping company to undertake, which violates OFAC's prohibition on transshipping to Iran. The Iranian shipping company told Amin to tell the U.S. manufacturer to "issue the packing list, invoice & certificate of origin" to the global shipping company which was based in the UAE ("the UAE shipping company"), not to the end recipient in Iran. This deception hid from U.S. Company 2 the fact that the ultimate end user of the servo motors was in Iran. Amin followed this guidance and subsequent emails between the conspirators and the Iranian shipping company show that the goods were successfully shipped from the U.S. to Iran via the UAE.

*Transaction 4—U.S. Company 3*

Beginning in July 2016, Arash and his coconspirators sent emails to railroad companies around the world to request price quotes for railroad crankshafts. In their nearly identical emails to companies in

9

the U.S. and elsewhere, the conspirators purported to be purchasing the parts on behalf of the Ministry of Transportation in Iraq—a lie. In response, a French company replied that it was "very closely in touch with requirements in Iraq and we know it is not for Iraq Railways." Arash replied the same day and insisted that the parts were for Iraq. Nonetheless, the French company refused to provide a price quote, stating that "my colleagues are in direct contact with the Iraq Railways and IRR [Iraqi Republic Railways] ha[s] told us that this requirement is not for them." Arash and his coconspirators ceased contact with that French company, but then sent dozens of other requests for railroad parts, purportedly on behalf of the "ministry of transportation in Iraq."

On October 27, 2016, Arash emailed U.S. Company 3 to ask about purchasing railroad crankshafts for the "ministry of transportation in Iraq." Arash filled out an End User Certificate indicating that the customer was the Iraqi Republic Railways in Baghdad. Records confirm that a bank in Hong Kong wired funds to U.S. Company 3 for one of the crankshafts and a bank in Turkey wired funds for a second crankshaft.

In February 2017, when it was time to arrange shipping from the U.S. to Iran, Amin emailed the UAE shipping company used in the

servo motor transaction to request a quote to ship the crankshafts from the U.S. to Iran via the UAE. The UAE shipping company provided a quote to ship the crankshafts from the U.S. to Bandar Abbas, Iran, "switched [transshipped] via J.Ali"—a port in the UAE.

When the crankshafts were ready, Amin emailed the UAE shipping company and told it to pick up the parts. The UAE shipping company acknowledged the shipment and asked for a contact person at U.S. Company 3. Arash responded, provided a contact at U.S. Company 3, and told the shipping company to "not mention anything about the cross-stuffing, only that the shipment is being taken to Dubai, UAE."

On February 25, 2017, the railroad crankshafts were exported from the U.S. allegedly to Iraq through the UAE. Yet, on April 20, 2017, the UAE shipping company sent Arash a bill of lading showing that the two crankshafts had been released in Bandar Abbas, Iran.

Finally, OFAC ran a license check on Arash, Amin, Momeni, and the three companies used to purchase goods from the U.S. destined for Iran, and found no OFAC license applications submitted on their behalf, and no OFAC licenses issued to any of these individuals or companies.

A grand jury indicted Arash, Amin, and Momeni in November 2020 on three counts: conspiracy to unlawfully export goods to Iran, conspiracy to smuggle goods from the U.S. to Iran, and conspiracy to engage in money laundering. ECF No. 1, PageID.1. Agents arrested Arash when he entered the United States from Canada on December 23, 2020. Canadian law enforcement provisionally arrested Amin on January 12, 2021, and the government is currently seeking his extradition. Amin is contesting extradition and has his next hearing later in March 2021. Momeni is believed to be in Iran, a country that does not have an extradition treaty with the United States.

Pretrial Services in the Western District of North Carolina interviewed Arash after his arrest in Charlotte (EDMI Pretrial Services provided a copy of this report and EDMI's Addendum to the parties and the Court on March 17 via email). Arash stated that most of his family still lives in Iran and that he has an Iranian Passport. Interestingly, Arash also claimed to have only $1,000 in assets but $1,258,000 in liabilities (including a $710,000 mortgage and a $490,000 personal loan). In his statements to Pretrial Services, Arash also claimed that his monthly income is $3,000 but that his monthly expenses are $6,620.

Pretrial Services in North Carolina found that Arash posed a risk of nonappearance based on the charged conduct; Arash's lack of ties to the United States; a lack of legitimate employment (Arash claims to be a dental student); and Arash's ties to Iran.

Pretrial Services in EDMI likewise concluded that Arash is a flight risk based on his ties to Iran and Canada—and complete lack of ties to the United States. Both Pretrial Services Offices agreed that there were no conditions or combination of conditions that would reasonably assure Arash's appearance and therefore recommended his pretrial detention.

On March 8, 2021, Arash moved this Court for release on bond. ECF No. 26, PageID.108.

## II.   Argument

Under the Bail Reform Act, a defendant must be detained pending trial if "no condition or combination of conditions will reasonably assure the appearance of the person as required […]." 18 U.S.C. § 3142(e)(1). The government must demonstrate a risk of nonappearance by a preponderance of the evidence. *United States v. Hinton*, 113 F. App'x 76, 77 (6th Cir. 2004).

13

The Court must consider the following factors when deciding whether to release or detain a defendant pending trial: the nature and circumstances of the offense, the weight of the evidence, the history and characteristics of the person, and the nature and seriousness of the danger posed by the person's release. 18 U.S.C. § 3142(g). A review of these factors shows that Arash is a significant flight risk if released on bond: the nature of the charges against him involve deceit, willful violations of U.S. law, and extensive knowledge of the routes that can be used to smuggle goods into Iran directly and through third parties; he has no ties to the United States, but significant business and personal ties to Iran and Canada; he has Iranian and Canadian passports; he has the means to flee; and—facing a lengthy prison sentence if convicted in this case—he has a strong incentive to flee.

1. <u>Nature and circumstances of the charged offenses</u>

The nature and circumstances of Arash's offenses support his detention. Evidence shows that Arash and his team lied to American companies to purchase more than $100,000 in goods destined for Iran. Arash and his coconspirators knew of U.S. sanctions against Iran and knowingly and intentionally evaded those sanctions. Arash now faces a

significant penalty if convicted: a guideline range of 78-97 months, based on the government's initial calculation.

In his motion for bond, Arash claims that he fled Iran and "has no intention of returning to Iran because of the likelihood that he would be subjected to incarceration and torture again due to his political affiliation." ECF No. 26, PageID.115. While undersigned counsel has no independent knowledge of Arash's claims, evidence shows that he knowingly obtained parts and equipment *directly on behalf of the Government of Iran and companies in Iran* well after he left for Canada. For example, Arash sent an email to a railroad equipment company in China in 2016 stating that he was procuring these parts for "the ministry of transportation in Iran." *See* Exhibit 1.

Further, Arash regularly told suppliers that he and his coconspirators were "the authorized purchasing agent for SAIPA company." *See* Exhibit 2. SAIPA is one of Iran's largest automobile manufacturers, headquartered in Iran, and is controlled by the Iranian government. *See*, *e.g.*, https://www.ifmat.org/06/19/iranian-government-controls-automotive-companies/ and

https://financialtribune.com/articles/auto/98624/gov-t-reiterates-plan-to-

privatize-ikco-saipa. Evidence shows that the EDM equipment Arash and his team acquired in transactions 1 and 2 was intended for SAIPA's EDM machine in Tehran: first, an EDM machine with serial number 10853 was sold to SAIPA in Tehran in 2004; second, Arash told a UK company in March 2015 that he needed parts for an EDM machine with serial number 10853; third, Arash, Amin, and Momeni circulated emails in October 2016 and January 2017 confirming that an EDM machine with serial number 10853 was in Tehran and operated by SAIPA.

And SAIPA works directly with Iran's Defense Ministry, the Islamic Revolutionary Guard Corps' [IRGC's] Aerospace Force, and the Iranian Army's Air Force, contrary to the interests of the United States. *See* https://financialtribune.com/articles/auto/106196/saipa-propels-localization-with-help-from-irgc-army.

Regardless of his reasons for leaving Iran, evidence shows that he knowingly procured goods for the Iranian government and companies in Iran after he left. This is a serious offense that warrants his detention.

2. The weight of the evidence against Arash

The weight of the evidence "goes to the weight of the evidence of [nonappearance], not the weight of the evidence of the defendant's

16

guilt." *United States v. Stone*, 608 F.3d 939, 948 (6th Cir. 2010); *see also United States v. Hazime*, 762 F.2d 34, 37 (6th Cir. 1985). The weight of the evidence of Arash's risk of nonappearance compels his detention.

As both Pretrial Services Reports confirmed, Arash has no ties to the United States or this district. None. Rather, Arash was born in Iran, has an Iranian passport, and has significant familial and business ties in Iran (in an interview with law enforcement on December 23, Arash's wife stated that she also was born in Iran and moved to Canada with Arash). Indeed, Arash's indicted coconspirator Momeni remains at large and is believed to be living in Iran.

Further, Arash spent years figuring out how to circumvent U.S. sanctions and move goods from the U.S. to Iran using international contacts and shipping channels. If anyone knows how to get back to Iran, Arash does. As described above, Arash has deep knowledge of international shipping, including contacts at international and Iranian shipping companies, experience with moving money through foreign bank accounts to finance illicit activity, and knowledge of how to falsify shipping documents. And if he makes it back to Iran, it is unlikely that he will ever face justice in this case as Iran does not extradite to the

United States. That Arash claims he does not wish to return to Iran does not prohibit him from doing so. *United States v. Kouchekzadeh*, No. 08-CR-03A, 2008 WL 1902434, at *3 (W.D.N.Y. Apr. 28, 2008) ("Although the defendant proffered that he is a refugee from Iran and has no intention to return there, the possibility exists that he could flee to Iran, where no extradition treaty exists.").

Arash's remaining ties are to Canada. Even if Arash simply returns to Canada, the government will have to extradite him: a process that can take years, as evidenced by the fact that Arash's brother, Amin, has yet to have his bail hearing even though Canadian authorities arrested him more than two months ago.

Arash claims that he is "willing to irrevocably waive his rights to an extradition hearing, in his new home of Canada or anywhere else." ECF No. 26, PageID 115. While that may be true now, "a waiver of extradition is not valid until an extradition request is actually pending in Canada." *Kouchekzadeh*, 2008 WL 1902434, at *3. Arash can withdraw his waiver at any point before then. *Id*. And "[s]ince an extradition request will not be made until the defendant refuses to appear, his offer to waive extradition at this time is of little value." *Id*.

Put another way, there is nothing preventing Arash from traveling to Canada, revoking his waiver of extradition, and forcing the U.S. to go through a lengthy extradition process that could take years to compel him to face charges in this district in this case. "The defendant's promise to return provides no guarantee that he will." *Id*.

Further, Arash has money (or access to it). He claims to have $1,258,000 in liabilities—including a $490,000 "personal loan"—and monthly expenses of $6,620: a $520 Tesla car payment, $3,900 for two housing payments (for a home mortgage and an apartment), and a $1,000 loan payment, among others. He also stated, however, that he is currently an unemployed student, his wife's monthly income is $3,000, and he has only $1,000 in assets. According Pretrial Services Report, Arash has an estimated monthly cash deficit of $3,620. On its face, Arash's financial disclosures to Pretrial Services strongly suggest that he has an alternative and undisclosed means of financing his lifestyle, including his sizable and recurring debt financing obligations. Whatever this source is, it is significant—thousands of dollars each month—and could provide an alternative means for Arash to flee.

Finally, it is worth noting that Arash fled Iran in violation of the terms of his early release from Iranian custody. *See* Exhibit B to ECF No. 26, Pages 5–6. Arash and his now-wife fled from Iran to Turkey in 2013, ultimately traveling to Canada. They were able to leave Iran "upon providing the Iranian government with lien/bond on his mother's home in the amount of approximately $30,000 USD." *Id*. at 5. Arash acknowledges that he "intended to flee Iran despite his original international travel ban, which was a condition of his conditional imprisonment/probation." *Id*. at 6. If released on bond, nothing prevents Arash from fleeing this jurisdiction for Iran, Canada, or a third county.

Given Arash's ties to Iran and Canada and his incentive (and available means) to flee, there are no conditions or combination of conditions that will reasonably assure his appearance.

### 3. Arash's history and characteristics

Arash did not sever ties with Iran and the Iranian Government after leaving. As shown above, Arash knowingly acquired equipment and technology for the Government of Iran and Iranian companies from his perch in Canada. Amin, who the government believes lived in Iran

20

at the beginning of the conspiracy and moved to Canada during the conspiracy, helped Arash obtain American goods for use in Iran.

Making matters worse, both Arash and Amin have a personal, working knowledge of America's OFAC sanctions against Iran. In his motion for bond, Arash admitted that he was an investigator for IBM. ECF No. 26, PageID.112. What he failed to mention, however, was that he was investigating money-laundering and OFAC compliance—as he told agents during his interview on December 23, 2020. Evidence also shows that Amin has significant OFAC and anti-money laundering experience with at least two different banks in Canada.

Arash appears to have a heart condition—a bicuspid aortic valve—that required surgery when he was 7 and 19 years old. ECF No. 26, PageID.112. Given Covid-19, he argues, his release is appropriate. The government disagrees for three reasons. First, Arash is 32 years old, meaning his surgeries were 13 and 25 years ago, and he himself admits that he "has not had any recent heart issues." ECF No. 26, PageID.112. Second, the CDC's list of heart conditions that increase an individual's risk of severe illness from Covid-19 does not include a bicuspid aortic valve. Third, both the Bureau of Prisons and the

Michigan Department of Corrections are offering vaccines to all of their inmates. The BoP has administered 86,902 doses of the vaccine as of March 22, and the Michigan Department of Corrections has vaccinated approximately 11,000 inmates. Arash's previous heart surgeries do not warrant his release.

Arash also allegedly suffers from post-traumatic stress disorder (PTSD) and claims that "there is a legitimate concern that being denied bond and detained in the present case will trigger [his] PTSD and depression." ECF No. 26, PageID.113–14. This argument likewise does not support his release. First, PTSD and depression are not on the CDC's list of conditions that increase an individual's risk of severe illness from Covid-19. *See also, e.g.*, *United States v. Kantaris*, No. 16-CR-3024, 2020 WL 3513702, at *4 (N.D. Iowa June 29, 2020) ("mental health alone is not the type of condition which itself increases an inmate's susceptibility to COVID-19."). Second, the Bureau of Prisons and Michigan Department of Corrections routinely treat inmates with mental health conditions, including PTSD.

Arash's history and characteristics do not support his release.

4. <u>Danger to the community and himself</u>

The government has no reason to believe that Arash poses a

danger to himself or the community if released.

### III.   Conclusion

For the reasons stated herein, the Court should detain the

defendant.

Respectfully Submitted,

Saima M. Mohsin
Acting United States Attorney

<u>*/s Hank Moon*</u>
Hank Moon
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan 48226
(313) 226-0220
hank.moon@usdoj.gov

Adam P. Barry
Trial Attorney
U.S. Department of Justice
National Security Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 233-0788
adam.barry@usdoj.gov

Date: March 22, 2021

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 22, 2021, I provided a copy of this

brief to defense counsel in this case via electronic filing.

> */s Hank Moon*
> Hank Moon
> Assistant United States Attorney

Exhibit 1

## Urgent Order - Rail Wheels

| | |
|---|---|
| From: | Arash Yousefi Jam <arash.yousefijam@gmail.com> |
| To: | ▮@railteco.com, ▮@railteco.com |
| Bcc: | amir199675@gmail.com |
| Sent: | July 20, 2016 5:18:22 PM CDT |
| Received: | July 20, 2016 5:19:02 PM CDT |
| Attachments: | IMG_0857.JPG, IMG_0858.JPG, IMG_0859.JPG |

Dear Sir/Madam,

We, Austin General Trading LLC. urgently require the following Railroad Wheels. We've been pre-approved for this tender for the ministry of transportation in Iran and urgently require a fair quote for these parts.

Please note to begin with, we require 100 wheels.

I'm currently in Toronto, Canada, should you require further details, do not hesitate to contact me via email or at +▮ ▮ 5898 <tel:▮ 5898> .

Our company details are as follow:

Austin General Trading LLC

Company Address: ▮, Al Qulaya Area,

Rolla, Sharjah, UAE

PO Box: ▮

Look forward to your prompt quotation.

Kind Regards,

Exhibit 2

## Fwd: VB: Nordic 1000 Maxi Parts Quotation Request

| | |
|---|---|
| From: | Arash Yousefi Jam <arash.yousefijam@gmail.com> |
| To: | Ameen <amin.yousefijam@gmail.com> |
| Sent: | November 18, 2016 10:49:33 AM CST |
| Received: | November 18, 2016 10:47:40 AM CST |
| Attachments: | image002.jpg, untitled, Quotation 161115-2 Austin General Trading LLC Quote.pdf, image002.jpg, untitled, untitled |

Sent from my iPhone

Begin forwarded message:

From: ▐▐▐▐▐ <▐▐▐@viewnet.eu <mailto▐▐@viewnet.eu>>
Date: November 18, 2016 at 9:41:12 AM EST
To: <arash.yousefijam@gmail.com <mailto:arash.yousefijam@gmail.com>>
Subject: FW: VB: Nordic 1000 Maxi Parts Quotation Request

Dear Arash,

Your email inquiry has been forwarded to us by Nordic Door AB, as our office is responsible for sales and after sales support for Nordic Door's products for your region.

Please find attached quotation as per your request. Kindly notice that some of the part numbers mentioned in your email inquiry are old part numbers, and some of them have been discontinued and not available anymore.

To be assured to order the correct parts, we always recommend our customers to provide us with the door number label, for each specific door. This way, we will be able to support you better with the parts you may need.

If you have any further questions, please do not hesitate to contact us.

Looking forward to hear from you at your convenience.

Best wishes,

▐▐▐▐

Viewnet Enterprise AB

▐▐▐▐▐

▐▐▐▐▐▐▐

Sweden

Tel:  +▐▐▐▐

Fax:  +▐▐▐▐

Mobile: +█████████

IMPORTANT - This email and any attachments may be confidential. Any retransmissions, dissemination or other use of these materials by persons or entities other than the intended recipient is prohibited. If received in error, please contact us and delete all copies. Before opening or using attachments, check them for viruses and defects. Our liability is limited to resupplying any affected attachments. [Any representations or opinions expressed in this e-mail are those of the individual sender, and not necessarily those of Viewnet Enterprise AB]

From: █████████ <█@nordicdoor.se <mailto:█@nordicdoor.se>>
Date: Wed, 9 Nov 2016 07:41:18 +0000
To: █████████ <█████@viewnet.eu <mailto:█████@viewnet.eu>>
Subject: VB: Nordic 1000 Maxi Parts Quotation Request

Från: Arash Yousefi Jam [mailto:arash.yousefijam@gmail.com <mailto:arash.yousefijam@gmail.com>]
Skickat: den 21 oktober 2016 04:06
Till: █████████
Ämne: Re: Nordic 1000 Maxi Parts Quotation Request

Hello,

Please note that we are the authorized purchasing agent for SAIPA company and we've placed orders for OCM doors and Ovitor parts as well.

The picture I provided are really clear and your manufacturing manager should definitely know what these are. Again, like I said, we are the only company that will place the final order, so I hope you'l take this into account and will quote us ASAP.

Please let me know.

Regards,

On Wed, Oct 19, 2016 at 8:29 AM, █████████ █@nordicdoor.se <mailto:█@nordicdoor.se>> wrote:

Dear Mr Arash,

We have now received the same inquire from 5 companies and we have understood that just this material the material is to be used for customers in Iran.

Please therefore contact our Iran representative, the Viewnet Technologies.

To establish the correct parts we need to the manufacturing numbers of the actual doors, and our representative may know this better.

Mail: ████@viewnet.eu <mailto:████@viewnet.eu>

Best regards

NORDIC door ab/ ████████

Från: Arash Yousefi Jam [mailto:arash.yousefijam@gmail.com <mailto:arash.yousefijam@gmail.com>]
Skickat: den 17 oktober 2016 15:39
Till: ████████ <█@nordicdoor.se <mailto:█@nordicdoor.se>>
Ämne: Re: Nordic 1000 Maxi Parts Quotation Request

Urgent Reminder !

On Fri, Oct 7, 2016 at 10:20 AM, ████████ @nordicdoor.se <mailto:█@nordicdoor.se>> wrote:

Dear Arash,

Some of these things are from an older design that we don't have in stock. I need a little more time to investigate.

To be sure I should really need to know the manufacturing numbers of the actual doors.

Best regards